UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| DONNA JANINE KING ) | Case No.  6:12-bk-02220-KSJ |
| Debtor. ) | Chapter 7 |
| ) | |

### MEMORANDUM OPINION DENYING MOTION TO DISMISS
### AND PARTIALLY GRANTING MOTION FOR RELIEF FROM STAY

Debtor, Donna King, and her ex-husband, Mitchel Kalmanson, have litigated issues relating to their divorce for several years longer than their marriage lasted. On the eve of the *perhaps* final hearing in the never ending divorce litigation, Debtor filed for bankruptcy to discharge her legal fees and any other liability arising out of her dispute with her ex-husband. Mr. Kalmanson has filed a motion to dismiss the bankruptcy, arguing debtor filed it in bad faith.[1] He also filed a motion seeking relief from the automatic stay for two reasons.  First, he asks permission to allow the state court to complete the divorce litigation at both the trial and appellate court level.  Second, he wants to continue litigating a tortious defamation claim in state court brought against the Debtor and several other defendants.[2]

Based upon the testimony presented by the parties on these two motions, the Court finds that the Debtor recently graduated from law school,[3] but she is not a licensed attorney.[4]  She holds a general contractor's license and a real estate license in Florida, and she is the president and majority shareholder of The Women's Rights Group, formerly known as The Custom

---

[1] Doc. No. 48.
[2] Doc. No. 51.
[3] Hearing March 31, 2012. Debtor graduated from law school in May, 2011.
[4] Debtor has not taken any bar exam. Hearing March 31, 2012.

Contracting Group.[5]  She once earned a substantial income as a general contractor,[6] but currently her business generates no income.  She has no other source of earnings.[7]

Mr. Kalmanson, who is in the insurance business, married the Debtor in 1991.[8]  Together they had two children, and, in 1999, Donna filed for divorce.  The parties have spent enormous amounts of money in their divorce litigation and have engaged in extensive discovery over Mr. Kalmanson's finances.[9]  According to the state court, "the litigation was out of control and unfocused."[10]  Debtor admits she continued to litigate because she believed her husband was lying and hiding money; she just did not know how much.[11]

On November 9, 2001,[12] arguably without full knowledge of Mr. Kalmanson's assets, the Debtor entered into a marital settlement agreement ("MSA") to settle the dispute.[13]  Unhappy with this resolution, a year later, on November 5, 2002, the Debtor filed a motion to set aside the MSA, otherwise known in Florida as a "12.540 Motion,"[14] claiming the MSA should be revoked because Mr. Kalmanson was hiding marital assets when the parties entered into the agreement.[15]  The state court eventually entered summary judgment in favor of Mr. Kalmanson, finding that, even though there was evidence that both parties had unclean hands,[16] the Debtor entered into the agreement knowing she did not have perfect information and believing Mr. Kalmanson was

---

[5] Kalmanson Exhibit 33 at 8. Debtor claims she changed the corporation's name from The Custom Contracting Group to The Women's Rights Group to reflect the research the company had been doing. Hearing March 31, 2012 at 9.
[6] Doc. No. 48, Exhibit 3 at 4.
[7] Hearing March 31, 2012 at 7.
[8] Kalmanson Exhibit 7 Exhibit A at 4; Kalmanson Exhibit 33 at 11.
[9] Kalmanson Exhibit 7 Exhibit A at 3.
[10] Kalmanson Exhibit 7 Exhibit A at 5.
[11] Hearing March 31, 2012 at 27 and 67. Debtor stated she "honestly thought that he (Mr. Kalmanson) had misrepresented what was there at the time." *Id.* at 67.
[12] Hearing March 31, 2012 at 10. The petition for dissolution of marriage was filed on January 21, 1999, but the divorce was not finalized until November 9, 2001. Doc. No. 1 at 103.
[13] Hearing March 31, 2012.
[14] Hearing March 31, 2012 at 10. The parties refer to the state court dispute as a "12.540 Motion," in reference to the Florida Rule of Civil Procedure 12.540 Relief from Judgment, Decrees, or Orders. The case pending in Lake County, Florida is Case No. 199-DR-178. Doc. No. 48 at 1.
[15] Doc. No. 865 in Case No. 1999 DR 000178 (Petition for Divorce filed in Lake County, Florida).
[16] Kalmanson Exhibit 7 Exhibit A at 12.

hiding assets.[17]  Debtor appealed.[18]  The Florida District Court of Appeals reversed in favor of the Debtor, finding genuine issues of material fact existed as to whether she relied on Kalmanson's alleged misrepresentations when she entered into the MSA and remanded the dispute back to the trial court.[19]

For now over ten years, the Debtor has been fighting to revoke the MSA to recover marital assets and to receive additional alimony.  Mr. Kalmanson has opposed her arguing no additional assets exist to distribute, and, even if they did, the Debtor knew of the assets when the MSA was signed. He suggests debtor's litigation was filed in retaliation for his child custody actions.[20]  Mr. Kalmanson also argues there is no basis to overturn the MSA because debtor has remarried twice since 2001, removing any argument debtor is entitled to additional alimony.[21]  This domestic war, still unresolved, is the predicate for debtor's bankruptcy.

During the ten years of litigation, nearly 3,000 pleadings were filed,[22] the Debtor and Mr. Kalmanson have demanded multiple judicial recusals, and the case has been transferred from one county to another.[23]  Debtor admits she did not know for certain whether Mr. Kalmanson was hiding assets, but remained "entrenched in her resolve" to discover the truth.[24]

Mr. Kalmanson not only defended himself from the Debtor's claims, but he went on the offensive and filed numerous pleadings himself.[25]  He admits to filing at least sixty-two motions for attorney's fees and sanctions against the Debtor for vexatious and frivolous litigation under

---

[17] Kalmanson Exhibit 7 Exhibit A at 2–6. The state court found the Debtor signed the MSA despite having a pending discovery request for additional information regarding Mr. Kalmanson's assets. *Id.* at 10.
[18] *Robinson v. Kalmanson*, 882 So.2d 1086 (Fla. Dist. Ct. App. 5th 2004). Robinson is the Debtor's maiden name.
[19] *Robinson v. Kalmanson*, 882 So.2d at 1088 (holding so because the trial judge placed a monetary cap of $15,000 on discovery, which "had the unintended consequence of cutting off discovery before at least one party felt it was fully exhausted. . . . [and] because of the limitation there is a factual issue concerning whether [debtor] was prevented from exploring specific omissions in the disclosures of the Former Husband, and therefore could not learn the full nature and extent of the financial position of the Former Husband.").
[20] Kalmanson Exhibit 7 at 8.
[21] Kalmanson Exhibit 6 at 4.
[22] Kalmanson Exhibit 1.
[23] Memorandum Opinion at 4, Case No.  6:04-bk-9253-KSJ.
[24] Hearing September 17, 2012.
[25] Memorandum Opinion at 4, Case No. 6:04-bk-9253-KSJ (In a prior related case filed by a friend of the Debtor, Linda Nofzinger, I noted, "Both Donna and Mitchel, irrespective of any action or involvement of the debtor, have used extremely aggressive litigation tactics against each other . . . . Kalmanson has hired at least 13 different and successive attorneys . . . . At the time of the trial in this bankruptcy case, at least 27 separate motions were pending in the Kalmanson divorce action."

Fla. Stat. § 57.205.[26] He also has filed numerous additional motions for costs, motions to dismiss, and motions for summary judgment, most of which remain unresolved to date.[27] All of these motions are founded on Mr. Kalmanson's underlying assertion that the Debtor's litigation is frivolous.[28] He also vehemently disputes debtor's claim that she does not have all the documents she needs to complete discovery.[29] In addition to these pleadings, Mr. Kalmanson filed a separate state court action accusing debtor and seven other defendants of tortious defamation (the "Defamation Action") for statements they made in connection with the parties' divorce.[30]

Both parties have expended huge sums of monies litigating their dispute. Mr. Kalmanson, has paid his attorneys' fees himself.[31] Debtor has borrowed perhaps as much as $1 million from her father.[32]

In 2010, the state court gave the Debtor cause to continue her fight, concluding "the competent, substantial, indeed, undisputed evidence clearly establishes that the former husband did not disclose to the former wife the existence . . . of four Century Bank accounts . . . at any time during the pending of the proceedings leadings up the entry of settlement agreements and final judgment for dissolution."[33] To address the issue, the state court appointed a Special Master to review the four undisclosed accounts and to determine, once and for all, whether any

---

[26] Doc. No. 93 at 2. *See also* Kalmanson's Exhibit 5 (listing the 62 Fla. Stat. 57.105 motions filed in Lake County, Florida); Kalmanson's Exhibit 6 (Kalmanson's renewed motion for attorneys fees and sanctions); Kalmanson's Exhibit 7 (Kalmanson's renewed motion for attorneys fees for vexatious and excessive litigation).
[27] *Id.*
[28] Kalmanson's Exhibit 5 at 5.
[29] See, for example, Kalmanson's Exhibit 10, as one of many motions to dismiss and motions for sanctions against the Debtor arguing she was in possession of all discovery documents at the same time she claimed she did not have the information she needed for discovery. Mr. Kalmanson argues the Debtor was in possession of these documents because she had them Bates stamped by the FBI when she, in yet another dispute, commenced an FBI investigation against Mr. Kalmanson. *Id.* Debtor argues Kalmanson repeatedly and stubbornly refused to turn over information necessary for her to conduct discovery and prove her case. Kalmanson Exhibit 21.
[30] Doc. No. 63 at 3 (referring to Case No. 2010-CA-001320 in Lake County, FL). Mr. Kalmanson argues debtor falsely stated to the U.S. Department of Justice, FBI, state prosecutor, Lake County Prosecutor, and others that Mr. Kalmanson was engaged in money laundering, extortion, witness tampering, threatening conduct, and intimidation, and that he had committed child abuse and sexual molestation. Kalmanson Exhibit 36 at 16-17.
[31] Kalmanson Exhibit 33 at 11.
[32] Doc. No. 48, Exhibit 3 at 3.
[33] Kalmanson Exhibit 37 Exhibit A at 5.

additional monies existed that would justify overturning the MSA.[34] Both parties agreed to the process and agreed to split the cost of the Special Master's fees.[35]

On July 15, 2011, the Special Master testified in open court that he had analyzed the Century Accounts and was fully advised of their contents and the sources and uses of the monies that flowed through them, with the exception of an unidentified $60,000 Certificate of Deposit.[36] The state court ordered both parties to meet with the Special Master to better understand his findings before a trial was set.[37] Debtor never met with the Special Master, and neither party fully complied with other pretrial procedures established by the state court.[38] Understandably exasperated, on August 4, 2011, the state court judge threw up his hands in frustration and said the following:

> The Court also finds that neither party has provided the proposed order they were instructed to provide at the conclusion of the last hearing. . . . However, such action is the future by any party, or their respective counsel, whereupon they are found to ignore the Order or directions of this Court shall be considered grounds for sanction that may include dismissal of a party's claim or defense, with prejudice. This matter is to be concluded timely, effectively, and efficiently. The Court will stand for no further delay, as the appropriate procedure for uncovering what can be learned from four (4) Century Bank accounts has been put in place. Now that the special master understands what the documents disclose, it is incumbent upon the parties to so apprise themselves and then make their case to the Court for how this matter should be finally resolved based on those documents."
>
> . . .
>
> The Court will continue to monitor the parties' progress to bring this matter to a timely close. Any party failing to abide by the procedures put in place will do so at their own peril of having appropriate sanctions imposed, which may include the striking of a party's entire claim, defense, or portions of a claim or defense.[39]
>
> . . .
>
> This case remains in need of strict supervision by the Court in order to insure that it is brought to a close, preferably on the merits. The parties continue to be unable,

---

[34] Kalmanson Exhibit 13.
[35] Doc. No. 48, Exhibit 11 at ¶ 6. The special master's fees totaled $20,714.58.
[36] Doc. No. 48, Exhibit 23 at 2; Doc. No. 48, Exhibit 11 at ¶1-2. According to the state court, no party objected to the special master's findings at the time.
[37] Doc. No. 48, Exhibit 13; Exhibit No. 23 at 2.
[38] Kalmanson Exhibit 13; Kalmanson Exhibit 16; Kalmanson Exhibit 24.
[39] Doc. No. 48, Exhibit 13 at ¶ 5.

> through their respective counsel or otherwise, to cooperate on even the simplest matter. The record reflects substantial time and effort invested in collateral motions that are rife with negative accusations levied against the opposing party and counsel. Motions to accomplish a final hearing addressing the four (4) Century Bank accounts that are dispositive of the former wife's motion that resurrected this divorce case more than ten years ago are few; cooperative effort toward that end, nil. After the comparatively brief seven (7) months' time the parties spent apart as "former spouses," the record in this case reflects that they continue to engage in activities that only serve to prolong their contact by perpetuating their relationship as adverse litigants, for reasons that remain known only to them. . . . Perhaps most disturbing is that the inability of these parties, (the biological parents of common children) to civilly communicate with one another has, time and again, proven to be contagious to their counsel. This fact is clearly reflected in the most recent report as exhibit "A". The Court has selected portions of the former wife's exhibit to attach to this Order as a specific example of the complete lack of common, if not professional, dignity that has infected this proceeding and made the Court's invocation of the current discovery and case monitoring rules necessary.[40]

The state court then set a final trial date, February 23, 2012, to resolve the discovery dispute, to review the Special Master's conclusions, and to settle whether any monies in the Century Bank accounts were marital assets subject to division.[41] The state court advised the parties it would impose sanctions and attorneys' fees against the Debtor if he found the monies in the accounts were non-marital. Likewise, if the state court found Mr. Kalmanson had been hiding marital assets in the undisclosed accounts, the Court would impose sanctions against him.[42]

On the very eve of trial, when it appeared the years of contentious litigation were finally nearing the end, the Debtor filed this Chapter 7 liquidation case on February 22, 2012.[43] Mr. Kalmanson promptly filed his motion to dismiss the Debtor's bankruptcy for bad faith,[44] presumably under § 707 of the Bankruptcy Code.[45] He also filed an alternative motion seeking relief from the automatic stay in the event the Court refused to dismiss the bankruptcy case. In

---

[40] Doc. No. 48, Exhibit 14 at ¶1-2.
[41] Doc. No. 48, Exhibit 15 Order on Hearing to Show Cause; Kalmanson Exhibits 23-25.
[42] Doc. No. 48, Exhibit 23 at 6-7.
[43] Hearing March 31, 2012 at 11. Case No. 6:12-bk-02220-KSJ.
[44] Doc. No. 48 Kalmanson's Motion to Dismiss. The motion also impermissibly sought to deny the Debtor her discharge under Section 727 of the Bankruptcy Code, which must be brought in as a separate adversary proceeding. The Court will take no action on this request to deny the Debtor's discharge until and only if the allegations are properly pled.
[45] All references to the Bankruptcy Code shall be to 11 U.S.C. Section 101 *et. seq*.

the stay relief motion, Mr. Kalmanson wants to to complete all litigation relating to the divorce and the MSA and also to pursue his Defamation Action.[46]

## Mr. Kalmanson's Motion to Dismiss is Denied

Under § 707(b) of the Bankruptcy Code, a court may dismiss a Chapter 7 bankruptcy for abusive filing.[47] A majority of courts consider filing a case in bad faith such an abuse and cause for dismissal.[48] The Eleventh Circuit Court of Appeals has not exactly defined what constitutes bad faith in considering the dismissal of a Chapter 7 case. Other courts focus on whether, prior to filing the Chapter 7 case, the debtor:

(i)     Pays all creditors except for one remaining creditor;
(ii)    Makes no lifestyle adjustments or continues living a lavish lifestyle;
(iii)   Files a case in response to a judgment, pending litigation, or collection action;
(iv)   Files a case with an intent to avoid a large, single debt;
(v)    Makes no effort to repay debts owed;
(vi)   Pursues the unfair of the use of Chapter 7;
(vii)  Has sufficient resources to pay outstanding debts;
(viii) Pays insider claims while refusing to pay non-insider debts;
(ix)   Inflates expenses to disguise financial well-being;
(x)    Transfers assets;
(xi)   Over-utilizes the protections of the Bankruptcy Code to the unconscionable detriment of creditors;
(xii)  Employs a deliberate and persistent pattern of evading a single major creditor;
(xiii) Fails to make candid and full disclosure;
(xiv) Has debts modest in relation to assets and income; or
(xv)  Files multiple bankruptcy filings or pursues other procedural "gymnastics."[49]

In at least one earlier decision, the Eleventh Circuit also considered similar factors such as the timing of the filing of the petition, whether the debtor is "financially distressed," whether the petition was filed strictly to circumvent pending litigation, and whether the petition was filed

---

[46] Doc. Nos. 25, 26, 51.
[47] 11 U.S.C. § 707(b)(1). This section allows a court to "dismiss a case filed by an individual debtor under [Chapter 7] whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter." There is no dispute debtor's debts are consumer debts.
[48] 11 U.S.C. § 707(b)(1) & (3). *See In re Piazza*, 451 B.R. 608, 613 (Bankr. S.D. Fla. 2011) (questioning whether bad faith is sufficient "cause" to dismiss under § 707(a), and concluding that the present majority includes bad faith as grounds for dismissal under § 707(b)(3)); *In re Boca Vill. Ass'n, Inc.*, 422 B.R. 318, 323 (Bankr. S.D. Fla. 2009) (also discussing the minority and majority positions as to whether bad faith is grounds for dismissal under § 707(a), and agreeing with the majority that "lack of good faith in commencing a Chapter 7 case can constitute cause for dismissal under § 707(a).").
[49] *In re Baird*, 2010 WL 337682 at *7 (Bankr. M.D. Fla. 2010) (citing *United States v. McDaniel (In re McDaniel)*, 363 B.R. 239, 244 (M.D. Fla. 2007).

solely to reject an unprofitable contract.[50] No single factor was dispositive, and several factors taken together cumulatively can indicate bad faith.[51] A court should look at the totality of the circumstances surrounding debtor's filing, "including the debtor's motive in filing, the purposes which will be achieved in the case, and whether the debtor's motive and purposes are consistent with the purpose of Chapter 7,"[52] keeping in mind that a "fresh start for individual debtors is at the core of federal bankruptcy law."[53] The "ultimate question is whether the petition was filed with the intent and desire to obtain the relief that is available under a particular chapter of the Bankruptcy Code, through the means that Congress has specified, or whether the debtor is pursuing some other goal.'"[54] The moving party bears the burden to show debtor has filed for some other reason that constitutes cause for dismissal.[55]

The issues before this Court are limited. They do not require a rehashing of all facts that unfolded in the state court divorce proceedings. This Court simply must determine whether the existence of any of the collective factors, taken in context with the myriad of reasons debtor states she filed this bankruptcy case, translates into a bad faith filing that would justify dismissal of debtor's Chapter 7 bankruptcy.

Mr. Kalmanson argues the protracted state court litigation that preceded this bankruptcy is indicative of the Debtor's bad faith in filing this case, claiming he is the victim of years of vexatious, pointless litigation.[56] He also argues dismissal is warranted because the Debtor has sufficient resources to pay her debts, is not financially distressed, and is using her law degree to "litigate for sport."[57] Lastly, Mr. Kalmanson claims the Debtor failed to make full and candid disclosure of her financial situation, identifying the following problems with debtor's schedules:

---

[50] *In re Dixie Broadcasting., Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989) (citations omitted).
[51] *In re Piazza*, 451 B.R. at 615 (citing *In re Scott*, 2010 WL 3087507, *4 (E.D.N.C. Aug. 6, 2010)).
[52] *In re Dixie Broadcasting, Inc.*, 871 F.2d at 1027 (11th Cir. 1989) (holding a court should consider the cumulative effect of all the evidence when determining bad faith).
[53] *In re Baird*, 2010 WL 337682 (M.D. Fla. 2010) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 563 (1994)).
[54] *In re Boca Vill. Ass'n, Inc.*, 422 B.R. 318, 324 (Bankr. S.D. Fla. 2009) (citations omitted).
[55] *In re Simmons*, 200 F.3d 738, 743 (11th Cir. 2000).
[56] Doc. No. 48 (Kalmanson's Motion to Dismiss for Bad Faith).
[57] *Id.* at 9.

(1) Debtor failed to distinguish between her personal assets and liabilities and those of her solely owned corporation—The Women's Rights Group—[58]which previously filed for Chapter 7 bankruptcy in 2012; (2) Debtor failed to list her father as a creditor in her original schedules,[59] even though she now claims she is indebted to him for over $1 million; (3) Debtor underrepresented her annual income as $24,000, even though the state court found she had an annual income of over $110,000;[60] and (4) Debtor undervalued her assets.[61]  Mr. Kalmanson further adds that, by filing bankruptcy to delay the impending trial in state court, "debtor is using this case as a subterfuge to avoid, delay, and frustrate the inevitable judicial decisions which will likely be entered against her in the divorce case, which would subject her to sanctions or attorney fees for willful and malicious injury."[62]

The Court rejects Mr. Kalmanson's argument and will not find any bad faith in this bankruptcy filing.  Debtor acknowledged pursuing various forms of litigation approaches against Mr. Kalmanson over the last ten years, reasoning she "only needed a good strong one to get the settlement agreement set aside."[63]  To some extent, the state courts have agreed with her and have held that material factual disputes existed as to whether Mr. Kalmanson was forthright about his finances.

Debtor now defends her bankruptcy filing, arguing she is buried in debt because her valid complaints were met with unnecessary challenges brought on by Mr. Kalmanson's virulent opposition and excessive discovery road blocks.[64]  She claims she sought relief in bankruptcy because she could no longer handle the state court action financially or emotionally. "She

---

[58] Kalmanson argues the Debtor failed to disclose business accounts, vehicles, and other assets of her company, The Women's Rights Group. Doc. No. 48 at 10-11. The Women's Rights Group has also filed for bankruptcy. Case No. 6:12-bk-06597-KSJ.
[59] Doc. No. 48 at 10.
[60] *Id.*
[61] Doc. No. 48 at 8–10.
[62] Doc. No. 48 at 11.
[63] Hearing March 31, 2012 at 48.
[64] Hearing March 31, 2012 at 29 and 44. Debtor claims she had a valid cause of action, but Mr. Kalmanson "just kept piling on and piling on, and he was supposed to turn over these documents in December, but he waited until three weeks before the case, and he drug it out as long as he possibly could and didn't allow me time to put on my case. And I asked for a continuance, and . . . Judge Tacak wouldn't give me the continuance; and he sanctioned me just for asking for a continuance that was filed in good faith."

couldn't handle Mr. Kalmanson's harassment from all of these proceedings, [and because she] couldn't handle his notice of all these different . . . issues before the Court that he was filing right before the hearing that was supposed to be about what his income that he didn't disclose was."[65] Ultimately, she found herself buried in the costs of litigation and persistent motions for sanctions by Mr. Kalmanson "with no end in sight."[66]

Contrary to Mr. Kalmanson's innocent requests for relief, the record before the Court illustrates a long, spiteful battle instigated and prolonged by *both* parties. The state court charged *both* parties with being disrespectful and uncooperative. Mr. Kalmanson essentially fought fire with fire and buried the Debtor in excessive and expensive litigation. He now cannot deprive the Debtor of her only exit, a bankruptcy discharge. This Court will not dismiss the Debtor's case on the theory only she is litigating for sport and filed in bad faith, when both parties appear equally engaged in their attempts to resolve their divorce issues with costly litigation.

The Debtor is suffering severe financial duress and has ample, legitimate financial reasons to file for bankruptcy protection. She cannot pay her bills, even with the assistance of her father.[67] She lists assets of $184,157, and liabilities of $1,183,306, in her bankruptcy schedules.[68] As a result of the MSA lawsuit, she clearly has incurred substantial liabilities for which she is unable to pay. The Court notes that, even if she only considers the non-contingent, liquidated, unsecured debts of only $275,000,[69] the Debtor still lacks the resources to pay her debts.

Debtor's explanation of her income discrepancy also sounds in reasonableness. Debtor testified that she listed her annual income as $24,000 in her initial schedules, but later amended

---

[65] Hearing March 31, 2012 at 44.
[66] Hearing March 31, 2012 at 11. Debtor testified she "was at the point of financial impossibility of ever seeing an end to the state court action, no matter how things went." Hearing March 31, 2012 at 68.
[67] Kalmanson Exhibit 33 at 10.
[68] Doc. No. 80 Amended Summary of Schedules.
[69] Under 11 U.S.C. § 109(e), only "an individual debtor that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $360,475" may file a Chapter 7 bankruptcy petition.

her schedules to increase her income to $100,000 a year to reflect a finding made by the state court.[70] Mr. Kalmanson argues the change, which came after numerous motions for sanctions for misrepresenting income, is indicative of the Debtor's bad faith.[71]

Debtor explains, however, that the change reflects reconsideration on her part as to what she considered "income." Debtor testified that the $24,000 income did not include funds she received from her father because she considered it a gift, not a traditional salary. After discussing the issue with her accountant, she concluded she was required to disclose other sources of income, including the money received from her father. She then promptly amended her schedules to reflect this higher amount. Now unemployed, debtor again has amended her schedules to reduce her projected annual income to $65,220,[72] $56,000 of which comes from money given to her by her family members, and the rest comes from alimony, maintenance, or support.[73]

The Court specifically finds filing bankruptcy to try to discharge liabilities for attorneys' fees incurred over the past ten years is not, on its face, bad faith warranting immediate dismissal. The purpose of bankruptcy is to give debtors a fresh start from their financial burdens. Bankruptcy offers hope for debtors, many of whom have made irreparable mistakes or unwise financial decisions. Like a debtor who incurs credit card debt beyond her ability to pay or who purchases a house with mortgage payments unrealistically high, the record here shows the Debtor has incurred litigation debt, properly or not, beyond her ability to deal with the financial consequences. The record also shows Mr. Kalmanson has contributed to the malevolent litigation that has led to this present state of affairs. The totality of the circumstances, including the lack of decorum attributed to *both* parties, the voluminous state court pleadings, and the

---

[70] Doc. No. 63 at 3.
[71] Doc. No. 51 at 12.
[72] Doc. No. 74. Debtor also lists expenses of the same amount—$65,220.
[73] Doc. No. 74 Amended Schedule I.

Debtor's staggering financial obligations, are sufficient to overcome Mr. Kalmanson's motion to dismiss. She did not file this case in bad faith. The motion to dismiss is denied.

The Debtor should not conclude, however, that finding she filed this case in good faith and denying a dismissal at this time does not result in any assurance that her debts are dischargeable. The right to a discharge is not fundamental[74] and may be withheld for many reasons stated in §§ 523 and 727, including dishonest, deceptive, and disingenuous debtor conduct.[75] Honesty and full financial disclosure are conditions precedent to a court's grant of a full discharge.[76] This fundamental requirement is intended to ensure trustees and creditors will have sufficient information to effectively evaluate the financial affairs of a debtor's estate.[77] The Court does not prohibit Mr. Kalmanson, or any other creditor, from properly challenging the Debtor's entitlement to a discharge in an appropriate adversary proceeding timely brought under Section 523 or 727 or the Bankruptcy Code, as he has done in filing a related Adversary Proceeding 12-AP-100. Whether or not the Debtor's obligations to Mr. Kalmanson, if any, are discharged will be determined in connection with the resolution of that adversary proceeding.

### KALMANSON'S MOTION FOR RELIEF FROM STAY IS PARTIALLY GRANTED

As a general matter, filing a bankruptcy petition operates automatically stops creditors from pursuing pending claims against a debtor.[78] Debtors are relieved, at least for a time, from the pressure and harassment of creditors seeking to collect on their claims. The automatic stay also promotes equal distribution of assets by preventing a single creditor from levying on property of the estate and getting more than their pro-rata fair share of the debtor's assets.[79] The

---

[74] *U.S. v. Kras*, 93 S.Ct. 631, 409 U.S. 434, 34 L.Ed.2d 626 (1973).
[75] *In re Taylor*, 190 B.R. 413, 416 (Bankr. D. Colo. 1995).
[76] *Broad Nat. Bank v. Kadison*, 26 B.R. 1015 (D. N.J. 1983). The purpose of the Bankruptcy Code provision denying a debtor a discharge for making false oath or account is to ensure that adequate information is available to those interested in administration of estate. *In re Kaiser*, 94 B.R. 779 (Bankr. S.D. Fla. 1988).
[77] *In re More*, 138 B.R. 102 (Bankr. M.D. Fla. 1992); *In re Pimpinella,* 133 B.R. 694 (Bankr. E.D.N.Y. 1991).
[78] 11 U.S.C. § 362 (a)(1).
[79] 3 Collier on Bankruptcy ¶ 362.03 at 362-23 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. rev. 2010).

automatic stay halts all legal proceedings, whether or not they seek to enforce dischargeable or nondischargeable debts.[80]

In appropriate circumstances, a court may modify the stay may "for cause."[81] Because the Bankruptcy Code does not define "cause," courts look to the surrounding circumstances to determine whether a party should be allowed to pursue a claim against a debtor during the pendency of a bankruptcy case[82] considering factors such as whether:

a) Any 'great prejudice' to either the bankrupt estate or the debtor will result from the continuation of a civil suit;
b) The hardship to the non-debtor party by maintenance of the stay considerably outweighs the hardship to the debtor; and
c) [whether] the creditor has a probability of prevailing on the merits of his case.[83]

The decision whether to terminate the automatic stay to allow a potential creditor to pursue pending state court action against a debtor lies with the sole discretion of the Bankruptcy Court, and should be made on case-by-case basis.[84]

Mr. Kalmanson seeks relief from stay to pursue three pending state court claims against debtor. First, Mr. Kalmanson's requests the right to pursue the numerous pending motions for sanctions and attorneys' fees arising from the MSA litigation at both the trial and appellate level.[85] Second, Mr. Kalmanson wants to complete the MSA litigation once and for all between the debtor and himself. Third, Mr. Kalmanson wants to pursue the Defamation Action pending against the Debtor and seven other defendants in Lake County, Florida.[86]

Mr. Kalmanson argues lifting the stay would promote judicial economy and would prevent the parties from having to expend precious court time by the Bankruptcy Court wasted

---

[80] *In re Merchant*, 958 F.2d 738, (6th Cir. 1992).
[81] 11 U.S.C. § 362(d)(1).
[82] *In re Robertson*, 244 B.R. 880, 882 (Bankr. N.D. Ga. 2000).
[83] *In re Williams*, 302 B.R. 923, 926 (Bankr. M.D. Ga. 2003).
[84] *In re Johnson*, 115 B.R. 634 (Bankr. D. Minn. 1989). Whether to grant relief from the stay to allow litigation to continue in another forum is within the sound discretion of the Bankruptcy Court. *In re Castlerock Properties,* 781 F.2d 159 (9th Cir. 1986). *In re Murray Indus., Inc.,* 121 B.R. 635, 636 (Bankr. M.D. Fla. 1990).
[85] Case No. 1999-DR-178 in Lake County, Florida; Case No. 2012-5D-79, pending in the Fifth District Court of Appeals. Doc. Nos. 25, 26, and 51.
[86] Case No. 2010-CA-0001320 in Lake County, Florida.

by relitigating the same issues already presented to the state courts.[87] He also claims he would suffer great prejudice if the stay were not lifted because "ten years of litigation would be lost and [he] would be required to expend additional sums to build the same case he has already established in the state court."[88]

Debtor opposes relief from stay, arguing she sought bankruptcy protection so she could be discharged of any liability for attorney fees and has no further desire to pursue the marital distribution claims in state court.[89]

The Court finds no great prejudice will result from allowing the marital settlement proceedings to continue in the state court forum. The parties have litigated these two interrelated divorce issues—whether the debtor is liable for any sanctions and whether the MSA is revocable—for over ten years generating more than 3,000 pleadings. The state courts, both at the trial and appellate level, were near resolution when the Debtor filed bankruptcy. The state court already is intimately familiar with these issues.[90] Allowing the divorce related matters to progress to a timely conclusion will require modest, additional resources from either party, as compared to the resources that would be expended if this Court heard the matters anew. Additionally, the state court has subject matter expertise in family law and is the most appropriate arbiter of those matters.[91] Lastly, judicial economy dictates relief from stay because the issues before the bankruptcy court are inextricably intertwined with pending state court

---

[87] Doc. No. 51 at 15.
[88] Doc. No. 51 at 15.
[89] Doc. No. 57 ay 1.

[90] *See In re Neal*, 176 B.R. 30 (Bankr. D. Idaho 1994) (allowing the automatic stay to be lifted as matter of judicial economy, where parties had already expended considerable effort and resources in state court, state court was familiar with the facts of case, and no hardship to debtors would result from litigating matter in state rather than in federal bankruptcy court).

[91] *Carver v. Carver*, 954 F.2d 1573, 1578 (11th Cir. 1992) (noting that bankruptcy courts should liberally grant relief to avoid entanglement in family matters best left to state court); *In re Taub*, 413 B.R. 55, 64 (E.D. N.Y. 2009) (citing *In re Newman,* 196 B.R. 700, 703 (Bankr. S.D.N.Y. 1996 ) (stating "bankruptcy courts will generally defer to state courts in the interest of judicial economy and restraint and out of respect for the state courts' expertise in domestic relations issues."); *Robbins v. Robbins (In re Robbins),* 964 F.2d 342, 345 (4th Cir. 1992) ("the bankruptcy court correctly placed equitable distribution disputes in the category of cases in which state courts have a special expertise and for which federal courts owe significant deference."); *In re Graham,* 14 B.R. 246, 248 (Bankr. W.D. Ky. 1981) (stating "It is appropriate for bankruptcy courts to avoid incursions into family law matters 'out of consideration of court economy, judicial restraint, and deference to our state court brethren and their established expertise in such matters.'"); *MacDonald v. MacDonald (In re MacDonald),* 755 F.2d 715, 717 (9th Cir. 1985) (same).

litigation, significant resources already have been expended, and the parties have litigated the dispute for an extended period of time.[92]  To force Mr. Kalmanson to duplicate his efforts in this Court would be both unfair and wasteful.

Moreover, allowing these matters to proceed in state court will not affect the Debtor's other creditors or the administration of her bankruptcy estate because the Trustee already has abandoned the Debtor's interest in any claims she has against her ex-husband Mitchel Kalmanson.[93]  Any amounts she recovers from her state court claims, if any, will never become property of the estate.

The Court, in weighing the prejudice to the Debtor against the harm caused to Mr. Kalmanson from refusing to modify the stay, finds the equities weigh in favor of allowing the state court at both the trial and appellate level to resolve **all** issues relating to the parties' divorce, including whether any sanctions are appropriate or whether the MSA is revocable.  The Court grants Mr. Kalmanson relief from the automatic stay to pursue the two divorce matters—the marital settlement resolution and debtor's appeal—but only to the determination of liability between the parties.[94]  If Mr. Kalmanson obtains a judgment in his favor, he then must file a claim in this Court.  He will be treated like any other unsecured creditor.

The same logic, however, does not apply to the Defamation Action, which was filed in 2010, is not near resolution like the divorce proceedings, and involves numerous other parties in addition to the Debtor.  Mr. Kalmanson has not demonstrated any imminent harm that would result if the proceeding were not stayed. The final resolution of Mr. Kalmanson's defamation

---

[92] *In re Saudners*, 103 B.R. 298, 299 (N.D. Fla. 1989) (granting relief from stay to pursue common law contract and tort claims against the debtor where the parties had been litigating the causes of action for two years); *In re Murray Indus., Inc.*, 121 B.R. 635, 637 (Bankr. M.D. Fla. 1990) (noting "to begin this litigation anew in this bankruptcy court would result in more of a hardship to the Movant and would certainly result in a waste of judicial resources.").

[93] Doc. No. 92. The trustee abandoned the case, stating "the lawsuit against Mr. Kalmanson has been involved in years of litigation, and the costs and attorneys' fees to pursue the burdensome cause of action equals or exceeds any value in the case."). *Id.*

[94] The risk of prejudice to creditors from lifting the automatic stay can be addressed by limiting the scope of the stay relief. *In re Taub*, 413 B.R. 55, 65-66 (Bankr. E.D.N.Y. 2009) (citing *In re Cole*, 202 B.R. 356, 362 (S.D. N.Y. 1996) (stating "As the *Cole* court found, '[t]he bankruptcy court can limit stay relief to the liquidation of the amount of the Movant's unsecured claim, and require her to return to the bankruptcy court to enforce her judgment through the claims allowance process.'")).

claims will require significant legal and judicial resources as well as coordination from the Debtor and the seven other defendants in the matter.[95] The state court has no unique expertise in resolving the Defamation Action and this is exactly the type of claim the automatic stay was designed to prevent from going forward after a bankruptcy is filed.[96] Given the purpose of bankruptcy is to provide a debtor relief from claims by her creditors, and no harm or prejudice will result from the stay of the Defamation Action, Mr. Kalmanson's motion for stay relief as to his request to continue prosecution of the Defamation Action is denied.

In conclusion, the Court will deny Mr. Kalmanson's motion to dismiss and will grant his request for stay relief to allow him to return to state court to finally resolve all issues relating to the parties' divorce, including whether sanctions against the Debtor are appropriate and whether the MSA is subject to revocation. The Court will deny Mr. Kalmanson's motion for relief from stay insofar as he seeks to continue with the pending Defamation Action. A separate order consistent with this Memorandum Opinion shall be entered simultaneously.

DONE AND ORDERED on December 5, 2012.

          KAREN S. JENNEMANN
          Chief United States Bankruptcy Judge

---

[95] Doc. No. 51 at 13.
[96] *See In re Atrium High Point Ltd. P'ship*, 189 B.R. 599, 605 (Bankr. M.D.N.C. 1995) (noting the purpose of the automatic stay is to stop all collection efforts and give the debtor a "breathing spell" so he can be relieved of the pressures that drove him into bankruptcy in the first place).